1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6                         SAN JOSE DIVISION

7
8    CARL SKIDMORE,
                            Petitioner,              Case No.  14-cv-04222-BLF

9
          v.                                         **ORDER DENYING MOTION FOR**
10                                                   **EVIDENTIARY HEARING; AND**
                                                     **DENYING AMENDED PETITION FOR**
11   JOE LIZARRAGA, Warden of California             **WRIT OF HABEAS CORPUS**
     State Prison at Mule Creek,
12                          Respondent.              [Re:  ECF 35, 62]

13

14          Petitioner Carl Albert Skidmore, a state prisoner represented by counsel, has filed an

15   amended petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction

16   and sentence imposed after a Sonoma County jury found him guilty of rape, sexual assault, and

17   molestation of his two stepdaughters.  Petitioner's sentence, as modified on appeal, is 307 years to

18   life in prison.

19          Petitioner asserts five claims of ineffective assistance of trial counsel, a claim that his

20   sentence is cruel and unusual, and a claim of cumulative error.  He has filed a motion for an

21   evidentiary hearing.  Both the amended habeas petition and the motion for evidentiary hearing

22   have been fully briefed.

23          For the reasons discussed below, the motion for an evidentiary hearing (62) is DENIED,

24   and the amended petition for writ of habeas corpus (35) is DENIED.

25   I.     FACTUAL BACKGROUND

26          The following factual summary is taken from the California Court of Appeal's opinion

27   addressing Petitioner's direct appeal.  *See People v. Skidmore*, No. A121339, 2009 WL 2766801

28   (Cal. Ct. App. Sept. 1, 2009).  The California Court of Appeal found as follows:

United States District Court
Northern District of California

### A.  Charges In This Case

An amended information charged Skidmore with 10 felony sex offenses against his stepdaughters, J.D. and A.D., who were under the age of 14.

With respect to victim J.D., Skidmore was charged with:  three counts of aggravated sexual assault of a child involving rape (Pen. Code, § 269, subd. (a)(1); counts one-three); forcible rape (§ 261, subd. (a)(2); count four); continuous sexual abuse of a child (§ 288.5, subd. (a); count five); forcible sexual penetration of a child (§ 289, subd. (a)(1); count six); and committing a lewd act on a child (§ 288, subd. (b)(1); count seven).

As to victim A.D., the amended information charged Skidmore with continuous sexual abuse of a child (§ 288.5, subd. (a); count eight) and two counts of perpetrating a lewd act on a child (§ 288, subd. (a); counts nine and 10).

In regard to all counts, the amended information alleged that Skidmore had a prior serious felony child molestation conviction (§ 288, subd. (a)) for purposes of the Three Strikes Law. (§ 1170.12.)  As to counts four through nine, it was further alleged that Skidmore committed the charged sexual offenses against multiple victims, and had a prior child molestation conviction under section 288, subdivision (a), for purposes of the One Strike Law.  (§ 667.61, subds. (b) and (e)(5), (a) and (d)(1).)

### B.  Case No. SCR-471023

While these charges were pending, Skidmore was convicted in case number SCR-471023 on a felony charge of soliciting another to commit an assault by means likely to produce great bodily injury. (§ 653f, subd. (a).)  This charge arose when Skidmore, while in jail on the sexual offense charges, arranged for his relatives to pay a former jail inmate to kill the molestation victims' mother, assault their older brother, and bribe the victims to withdraw their allegations. Sentencing was deferred pending the completion of trial on the current charges.

### C.  Trial in This Case (SCR-458973)

Jury trial commenced in January 2008.

#### 1.  Skidmore's Prior Sexual Abuse of a Stepdaughter

Skidmore's former stepdaughter, T.B., testified that Skidmore sexually molested her periodically from the time she was about seven or eight years old, to the time she was about 12 or 13 years old.  T.B.'s mother was an alcoholic, and Skidmore molested T.B. while the mother was asleep.   Specifically, Skidmore went to T.B.'s bed, fondled her, and inserted his fingers in her vagina.  He convinced T.B. not to tell her mother because, if she did, her mother would leave her.  At one point before T.B. turned 11 years old, Skidmore also tried to have sexual intercourse with her. When she told him to stop because of the pain, he became frustrated and told her that "men didn't like prick teases."

Certified documents established that Skidmore pled guilty to one count of child molestation (§ 288, subd. (a)) in July 1985.

After T.B.'s mother learned that Skidmore was engaged to Patricia H. (the mother of the child victims in this case), she informed Patricia that Skidmore was a registered sex offender. Patricia nonetheless married Skidmore in 2002.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2. Skidmore's New Victims

Patricia's two daughters from a prior marriage – J.D. born in August 1990, and A.D. born in July 1993 – lived with Patricia and Skidmore. Patricia's son Jey and his girlfriend Antoinette sometimes lived with them also.

Like T.B.'s mother, Patricia was an alcoholic, and she got drunk every night after work. She never told J.D. or A.D. that Skidmore was a registered sex offender. As he had done to T.B., Skidmore molested J.D. and A.D. while their mother was asleep.

### 3. Sexual Abuse of J.D. (Counts 1-7)

One night when J.D. was 12 years old on a family vacation, Skidmore rubbed her leg, put his hand inside her shorts, rubbed her vagina, and inserted his finger into her vagina. He told her to "be quiet" and that she would "like it."

About two weeks after the family returned home, Skidmore resumed his molestation of J.D. About 5:30 or 6:00 a.m., he entered her bedroom, rubbed her leg and vagina, and inserted his fingers into her vagina. He told her it was "what [they were] supposed to be doing" and it was "a special thing." Frightened, J.D. pushed Skidmore's hand away and told him to stop, but he continued anyway.

For nearly a year, Skidmore molested J.D. in the same manner two to three times a week, for about a half hour each time, while her mother was sleeping. He also touched her breasts and once asked her to kiss his exposed penis.

J.D. testified that, when she was 13 in January 2004, Skidmore "started raping me." After inserting his fingers into her vagina, he took off his pants and told her, "we're going to try something new." She told him "no" and said she was scared, but he continued. He got on top of her, rubbed his penis against her vagina, and then inserted his penis in her vagina. She cried from the pain.

About a week later, Skidmore had intercourse with J.D. in her bedroom again. From then on until February 2005, he had intercourse with J.D. about two or three times a week. They had intercourse over 20 times.

While Skidmore was molesting her, he would tell J.D. that they could go shopping when they finished. Skidmore bought J.D. "everything [she] wanted." He also bought her sexy underwear, including a lace bra and matching thong, which he had J.D. pose in.

Skidmore told J.D. that if she told anyone what he was doing to her, it would break her mother's heart, break up the family, and cause him to go to jail. She did not report the abuse because she believed she was protecting her little sister A.D., her family had been poor before they met Skidmore, and Skidmore "could hurt [her]." When she did confide in her mother once, Skidmore accused her of lying, and her mother proceeded to drink even more and cried constantly. Seeing her family adversely affected, J.D. recanted. About a week or two later, Skidmore resumed raping her two or three times a week.

The last time they had intercourse was in late February 2005, a few days before Skidmore was arrested. On that occasion, J.D. used a pink towel to wipe off her vagina. J.D. gave the towel to the police after Skidmore was arrested.

3

#### 4.  *Sexual Abuse of A.D. (Counts 8-10)*

Skidmore started molesting A.D. when she was 11 years old, beginning sometime between the start of school and Christmas 2004.  The first time he entered her bedroom in the morning while everyone else was asleep, and rubbed her back and her breasts.  Beginning about a month later, he would rub her vagina as well.  He did this every day, once in the morning and once again in the afternoon, for several months.

In February 2005, Skidmore's molestation of A.D. escalated.  In addition to rubbing her breasts and vagina, he removed her clothing and put his mouth on her vagina.  This continued twice a day throughout the month.  At one point, Skidmore had A.D. wear a lacy pink thong for him.

A.D. did not report Skidmore's abuse because she was scared and wanted "to save [her] sister."  In addition, Skidmore had warned her that if she told anyone, he would never buy anything for her again.  A.D. also thought no one would believe her, because when she previously told her mother that she had seen Skidmore and J.D. kissing and naked together in J.D.'s bedroom, they denied it.

On the last day of February 2005, Skidmore went to A.D.'s bedroom around 6:00 a.m.  He rubbed her breasts and buttocks, pulled down her pants, and orally copulated her as usual.  This time, however, he also rubbed his penis against her vagina and tried to make her touch it.  He told A.D., "I'll see you once I get home from work," and "[o]nce we do it, I'll give you a big prize." A.D. testified:  "I was afraid he was going to rape me the next day."

#### 5.  *Additional Evidence*

Meanwhile, Jey's girlfriend Antoinette (Nettie) became concerned about J.D. and A.D.  She noticed that J.D., who usually did very well in school, no longer wanted to do her homework and was not as outgoing as before.  A.D. was displaying similar behavioral problems as well.  Nettie also observed that Skidmore was buying J.D. "inappropriate clothing," such as thong underwear, low-cut shirts, and "unbelievably short skirts."

J.D.'s older cousin, Monique, testified that she once saw Skidmore's hand on J.D.'s thigh in a sexual manner.  Further, she testified, Skidmore "always wanted to touch" J.D.

Late at night on March 1, 2005, while Skidmore was at work and Patricia was asleep, Jey, Nettie, and Monique confronted J.D. with their suspicions that Skidmore was molesting A.D. and perhaps J.D.  J .D. initially denied she was being molested but said she believed Skidmore was molesting A.D.  J.D. then started to cry and admitted that for two years Skidmore had been molesting her as well.  As they confronted Patricia, A.D. emerged from her room, crying.  She explained:  "I'm crying because I'm happy because I know it's over."  A.D. thought Skidmore was going to rape her the next morning.

After the police were called, they had J.D. make a pretext telephone call to Skidmore. Skidmore told J.D. to lie and deny that there was ever any sexual contact between them, because otherwise he would go to jail.  The tape of the telephone call was admitted into evidence and played for the jury.

The police interviewed J.D. and A.D., and audiotapes of their interviews were admitted into evidence and played for the jury.  The sisters underwent sexual

4

assault examinations and were swabbed for DNA evidence. Expert witnesses testified at trial that J.D.'s pink towel contained seminal fluid, and swabs of J.D.'s and A.D.'s breasts contained male DNA, all of which included Skidmore as a statistically likely source.

Dr. Anthony Urquiza, an expert in Child Sexual Assault Accommodation Syndrome, testified about the reasons child victims of sexual abuse may not immediately report molestations and often recant.

>    *6.     Defense Case*

Skidmore did not call any witnesses of his own. He rested his case on the state of the evidence.

>    *D.     Jury Verdict and Sentence*

The jury returned guilty verdicts on counts one, two, three, four, six, seven, nine, and 10, and on the lesser included offense of lewd act on a child (§ 288, subd. (a)) on count eight. Skidmore was acquitted on count five. The jury found the One Strike allegations true. The court found the Three Strikes allegations true.

The court sentenced Skidmore to a determinate term of 25 years four months, plus an indeterminate term of 290 years to life in state prison. The determinate term consisted of consecutive 12-year terms on counts eight and 10, calculated by doubling the full six-year midterm under the Three Strikes Law, and a consecutive 16-month term in the consolidated case, SCR-471023, calculated by doubling one-third of the two-year midterm under the Three Strikes law. The indeterminate term consisted of consecutive 30-year to life terms on counts one, two, and three, calculated at 15 years to life doubled under the Three Strikes law, and consecutive 50-year to life terms on counts four, six, seven, and nine, calculated at 25 years to life under the One Strike law, doubled under the Three Strikes law.

*People v. Skidmore*, 2009 WL 2766801, at *1-4.

## II.     PROCEDURAL BACKGROUND

### A.     Direct Review

The California Court of Appeal reduced Petitioner's sentence on count 8 from twelve to four years and otherwise affirmed the judgment in an unpublished decision issued September 1, 2009. *See People v. Skidmore*, 2009 WL 2766801, at *8.

The California Supreme Court denied review on November 10, 2009. *See* Am'd Pet. Exh. 18, ECF 35-2.

### B.     State Habeas Proceedings

In December 2009, Petitioner retained counsel, Angelyn Gates, to file a federal habeas petition for a flat fee of $15,000. *See* Am'd Pet. Exh. 3, ECF 35-1. In June 2010, Ms. Gates received an additional $45,000. *See* Am'd Pet. Exh. 4. Ms. Gates did not prepare or file either a

state or federal habeas petition on Petitioner's behalf.  In March 2013, Petitioner fired Ms. Gates.  *See* Am'd Pet. Exh. 1.  In May 2013, Petitioner paid new counsel, David Carico, $15,000 to review his case.  *See* Skidmore Decl. ¶ 94, Am'd Pet. Exh. 34.  In October 2013, Mr. Carico met with Petitioner and requested in excess of $35,000 to prepare a federal habeas petition.  *See id.* ¶ 105.  Petitioner did not have the funds to retain Mr. Carico.  *See id.* ¶ 106.

Petitioner then began filing pro se state habeas petitions.  *See* Skidmore Decl. ¶ 107, Am'd Pet. Exh. 34.  He filed a petition for writ of habeas corpus in the Sonoma County Superior Court, which was denied in a reasoned decision on January 28, 2014.  *See* Am'd Pet. Exhs. 19, 20.  He filed a petition for writ of habeas corpus in the California Court of Appeal, which was denied as unexhausted on March 19, 2014.  *See* Am'd Pet. Exhs. 21, 22.  He filed a second petition for writ of habeas corpus in the California Court of Appeal, which was denied summarily on April 9, 2014.  *See* Am'd Pet. Exhs. 23, 24.  And he filed a petition for writ of habeas corpus in the California Supreme Court, which was denied summarily on July 23, 2014.  *See* Am'd Pet. Exhs. 25, 26.

On June 8, 2014, Skidmore retained current counsel, James Thomson.  *See* Skidmore Decl. ¶ 117, Am'd Pet. Exh. 34, ECF 35-2.  Mr. Thomson filed a second habeas petition in the California Supreme Court, which was denied on state procedural grounds on January 14, 2015.  *See* Am'd Pet. Exhs. 31, 32.

### C.    Federal Habeas Proceedings

While Petitioner was filing pro se habeas petitions in the state courts, he simultaneously was filing pro se habeas petitions in federal district courts.  He filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of California in January 2014, which was immediately transferred to the Northern District of California.  *See* Am'd Pet. Exhs. 27, 28.  Magistrate Judge Jacqueline Scott Corley, to whom the case was assigned upon transfer, dismissed the petition without prejudice for failure to pay the filing fee or complete an application to proceed in forma pauperis.  *See* Am'd Pet. Exh. 28.

Petitioner filed a second pro se federal habeas petition in the Northern District of California, which was assigned to Judge Corley.  *See* Am'd Pet. Exhs. 29, 30.  On March 27, 2014, Judge Corley dismissed the petition without prejudice as wholly unexhausted.  See Am'd

Pet. Exh. 30.

Petitioner's counsel, Mr. Thomson, filed a third federal habeas petition – commencing the present action – in the Northern District of California on September 18, 2014.  *See* Petition, ECF 1.  The case was assigned to Judge Corley, who granted Petitioner's motion to stay and abate to permit him to exhaust claims in state court.  *See* Order Granting Petitioner's Motion to Stay, ECF 5.  It was during that stay period that Mr. Thomson filed a habeas petition on Petitioner's behalf in the California Supreme Court, as discussed above.  On February 25, 2015, Judge Corley granted Petitioner's motion to lift the stay, and she ordered Respondent to file a response to the petition.  Order Granting Petitioner's Motion to Lift Stay, ECF 9.  The case thereafter was reassigned to the undersigned on July 7, 2015.  *See* Order of Reassignment, ECF 15.

On July 13, 2015, Respondent moved to dismiss the petition as untimely.  *See* Motion to Dismiss, ECF 16.  In opposition, Petitioner conceded that his conviction became final in February 2010, and that the one-year statute of limitations to file a federal habeas petition expired in February 2011, well before he filed the present action in September 2014.  *See* Opposition, ECF 23.  However, Petitioner asserted that he is entitled to equitable tolling of the statute of limitations due to the misconduct of his former counsel, Ms. Gates.  *See id*.  The motion to dismiss was heard on January 21, 2016.  *See* Minute Entry, ECF 27.  On January 28, 2016, the Court granted the motion, holding that Petitioner had not alleged sufficient facts to support a finding of extraordinary circumstances warranting equitable tolling of the limitations period.  Order Granting Respondent's Motion to Dismiss, ECF 29.  However, the Court granted Petitioner's request for leave to amend the petition to allege additional facts in support of equitable tolling.  *See id*.

### 1.    Operative Amended Petition

Petitioner, through counsel, filed the operative amended petition on September 18, 2016, adding factual allegations supporting Petitioner's request for equitable tolling of the statute of limitations.  *See* Am'd Pet., ECF 35.

The amended petition contains five claims for ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution:  (1) trial counsel was ineffective in failing to adequately investigate and challenge the DNA evidence; (2) trial counsel

was ineffective in failing to investigate and present evidence that J.D. had denied that any abuse has occurred; (3) trial counsel was ineffective in failing to seek to exclude testimony concerning Petitioner's prior conviction; (4) trial counsel was ineffective in failing to investigate the factual and legal issues in the case; and (5) trial counsel was ineffective in failing to object to the introduction of unreliable evidence. The amended petition also asserts that: (6) the sentence of 307 years to life in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment; and (7) the cumulative effect of the errors alleged in the amended petition deprived Petitioner of a fair trial in violation of the Due Process Clause of the Fifth Amendment. Am'd Pet., ECF 35.

Respondent did not file a renewed motion to dismiss; instead he filed an answer on December 1, 2016. *See* Answer, ECF 41. In his answer, Respondent took the position that "the petition should have been dismissed with prejudice upon the granting of respondent's motion to dismiss." Answer at p. 4. n. 4, ECF 41. However, Respondent did not challenge Petitioner's showing on the issue of equitable tolling. *See* Answer, ECF 41.

Petitioner filed a traverse, reiterating his argument that he is entitled to equitable tolling as well as addressing the merits of his claims. *See* Traverse, ECF 57-6.

On January 22, 2018, Respondent filed an objection to new exhibits submitted with the traverse. *See* Objection to Evidence, ECF 60. Petitioner filed three briefs in response to the objection, which were stricken by the Court with leave to file a single brief in response to the objection. *See* Order, ECF 72. On May 15, 2018, Petitioner filed the permitted single response to Respondent's objection. *See* Reply to Objection, ECF 73-4.

## 2. Motion for Evidentiary Hearing

Petitioner filed a motion for an evidentiary hearing on the issue of equitable tolling and on Claims 1, 2, 3, 4, 5, and 7. *See* Motion for Evid. Hrg., ECF 62. Respondent filed an opposition to the motion on May 9, 2018, arguing that no hearing is required with respect to equitable tolling because Respondent has conceded that issue. *See* Opp. to Motion for Evid. Hrg., ECF 71. Respondent stated that, although he believes his motion to dismiss should have been granted with prejudice rather than with leave to amend, "[n]ow that petitioner has been given a second bite at

the apple, respondent does not dispute petitioner's ability to show sufficient grounds for equitable tolling." *Id*. at 22. Respondent also argued that Petitioner is not entitled to an evidentiary hearing on any of his claims. *Id*. at 1-21.

On May 22, 2018, Petitioner filed a reply with respect to his motion for an evidentiary hearing. Reply Re Motion for Evid. Hrg., ECF 77. In the reply, Petitioner agreed that in light of Respondent's concession that Petitioner is entitled to equitable tolling under the facts alleged in the amended petition, there is no need for an evidentiary hearing on equitable tolling. *Id*. at 30. However, Petitioner requests an evidentiary hearing on Claims 1, 2, 3, 4, 5, and 7. *Id*. at 31.

In deciding whether to grant an evidentiary hearing, a district court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id*. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Accordingly, the Court first considers whether Petitioner could be entitled to habeas relief based on the claims asserted in the amended petition, and then it takes up Petitioner's motion for an evidentiary hearing.

## III. PETITIONER IS NOT ENTITLED TO HABEAS RELIEF

As set forth above, the amended petition contains five claims asserting that Petitioner's trial counsel provided ineffective assistance in violation of the Sixth Amendment (Claims 1-5), a claim that the sentence of 307 years to life in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment (Claim 6), and a claim that the cumulative effect of the errors alleged the amended petition deprived Petitioner of a fair trial in violation of the Due Process Clause of the Fifth Amendment (Claim 7). Am'd Pet., ECF 35.

### A. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant relief on any habeas claim that was "adjudicated on the merits" by a state court

unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In determining whether the requirements of § 2254(d) are met, a district court is limited to the state court record. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *Gulbrandson v. Ryan*, 738 F.3d 976, 993 & n.6 (9th Cir. 2013) (clarifying that *Pinholster*'s "evidentiary limitation is applicable to § 2254(d)(2) claims as well").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court decision is "contrary to" Supreme Court authority and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (overruled on other grounds in *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

When the last state court to adjudicate a federal constitutional claim on the merits did not provide an explanation for the denial, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "It should then presume that the unexplained decision adopted the same reasoning." *Id*. However, that presumption may be rebutted upon a "showing

10

that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

If there is no lower court decision to look to, it is presumed that an unexplained denial is on the merits absent any indication to the contrary. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011). In that case, the federal court must determine "what arguments or theories supported or . . . could have supported" the challenged state court decision, and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of [the Supreme Court]." *Id.* at 102. "Accordingly, when the state court does not supply reasoning for its decision, [federal courts] are instructed to engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable." *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) (internal quotation marks and citation omitted). "Crucially, this is not a de novo review of the constitutional question." *Id.* (internal quotation marks and citation omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal quotation marks and citation omitted).

When a habeas claim was not adjudicated on the merits, the district court must review the claim de novo. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Even if a petitioner establishes a constitutional violation under the relevant standard, the habeas inquiry is not at an end. *See Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015). "[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.''" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197-98.

### B. Objection to New Evidence Submitted with Traverse

Before applying these standards to Petitioner's claims, the Court addresses Respondent's objection to Petitioner's submission of new evidence with his traverse. In support of his traverse, Petitioner submitted Exhibits 44-52 ("Traverse Exhibits"), which were neither presented to the California Supreme Court nor attached to the amended petition in this Court. Respondent objects

to consideration of the new exhibits. The Court has considered both the objection and Petitioner's response thereto.

The objection is well-taken with respect to Claims 1, 2, 3, and 6, because those claims were denied on the merits and thus review of them is limited to the state court record under *Pinholster*. Claims 1, 2, and 3 were raised in a pro se habeas petition filed in the California Supreme Court and denied summarily. *See* Am'd Pet. Exhs. 25, 26. Claim 6 was raised in a petition for direct review filed in the California Supreme Court and also denied summarily. *See* ECF 16-1, Am'd Pet. Exh. 18. Those denials constituted adjudications on the merits for purposes of § 2254(d). *See Richter*, 562 U.S. at 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

However, Respondent has not provided an adequate basis for excluding the new exhibits with respect to Claims 4, 5, and 7. Claims 4 and 5, alleging ineffective assistance of counsel, and Claim 7, alleging cumulative error, were raised in Petitioner's represented habeas petition filed in the California Supreme Court and denied as untimely. See Am'd Pet. Exhs. 31, 32. Because the denial was not on the merits, Claims 4, 5, and 7 are subject to de novo review by this Court. *See Pirtle*, 313 F.3d at 1167 ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, [the district court] must review it de novo."). The limitations of § 2254(d) do not apply to claims that were not adjudicated on the merits by a state court, and "[a]s a result, review of such claims is not necessarily limited to the record before the state court." *Gentry v. Sinclair*, 705 F.3d 884, 897 (9th Cir. 2013).

Respondent asserts that the Court's consideration of the new exhibits in connection with any of Petitioner's claims would so significantly alter the claims as to render them unexhausted. *See Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988) ("In habeas proceedings, the federal courts are not free to entertain new evidence that places the claim in a significantly different posture, when that evidence was never presented to the state courts."). In opposition to the objection, Petitioner counters that "[u]nder the exhaustion test, a petitioner can introduce

additional facts to support a claim on federal habeas review so long as he presented the 'substance' of the claim to the state courts." *Gimenez v. Ochoa*, 821 F.3d 1136, 1141 (9th Cir. 2016). "That the additional facts provide more sophisticated or reliable support is of no moment where the information does not 'fundamentally alter the legal claim already considered.'" *Id.* Petitioner correctly points out that Respondent has not explained how any of the new exhibits alter Petitioner's claims, let alone "fundamentally alter" them. Having reviewed Traverse Exhibits 44-52, the Court concludes that they do not alter the substance of Claims 4, 5, and 7 as those claims were presented to the California Supreme Court.

Respondent also argues that to the extent the exhibits were available before the amended petition was filed, they should be deemed waived. However, the cases cited by Respondent addressed circumstances in which a petitioner sought to raise entirely new arguments or claims in the traverse. *See, e.g., Delgadillo v. Woodford*, 527 F.3d 919, 930 (9th Cir. 2008) ("Delgadillo argues for the first time in his reply brief that he was prejudiced by counsel's failure to object to the admission of hearsay testimony . . . [a]rguments raised for the first time in petitioner's reply brief are deemed waived."); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."). Those cases are factually distinguishable from the present case, in which Petitioner submits the new exhibits to bolster claims alleged in the amended petition.

Accordingly, Respondent's objection to Traverse Exhibits 44-52 is SUSTAINED as to Claims 1, 2, 3, and 6, and OVERRULED as to Claims 4, 5, and 7.

## C.     Claims 1-5 (Ineffective Assistance of Counsel)

Claims 1-5 allege ineffective assistance of trial counsel. Petitioner was represented at trial by lead counsel Chris Andrian and associate Richard Scott. *See* Am'd Pet. at 13, ECF 35. Petitioner does not distinguish between the two attorneys in his claims, and the Court understands Petitioner to be challenging both attorneys' effectiveness. For the sake of simplicity, however, the Court uses the singular "counsel" in this order.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of

counsel. *Strickland*, 466 U.S. at 686. To prevail on a Sixth Amendment claim for ineffective assistance of counsel, a petitioner must establish that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Id*. at 687.

To prove deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id*. at 688. "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir.1998). "'Judicial scrutiny of counsel's performance must be highly deferential,' and courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *West v. Ryan*, 608 F.3d 477, 486 (9th Cir.2010) (quoting *Strickland*, 466 U.S. at 689).

To prove prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (internal quotation marks and citation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Richter*, 562 U.S. at 105 (internal quotation marks and citation omitted). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Id*. "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id*. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id*. (internal quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

1.     **Claim 1 - Ineffective Assistance in Failing to Adequately Investigate**

**and Challenge the DNA Evidence**

In Claim 1, Petitioner asserts that trial counsel failed to adequately investigate and challenge the DNA evidence presented by the prosecution. The claim was raised in Petitioner's pro se habeas petition filed in the California Supreme Court and denied summarily. *See* Am'd Pet. Exhs. 25, 26. No lower court issued a reasoned decision addressing this claim.

Petitioner asserted in his amended petition that Claim 1 (along with Claims 2 and 3) was raised to and denied by the Sonoma County Superior Court, which issued a reasoned decision. *See* Am'd Pet. at 2, ECF 35. However, the pro se habeas petition filed in the Sonoma County Superior Court did not reference the Sixth Amendment or federal constitutional standards for ineffective assistance of counsel. *See* Am'd Pet. Exh. 19. Nor did the Superior Court's order denying the petition. *See* Am'd Pet. Exh. 20. Consequently, Petitioner's Sixth Amendment claims were not fairly presented to or disposed of by the Sonoma County Superior Court. *See Fields v. Waddington*, 401 F.3d 1018, 1021 (9th Cir. 2005) (To alert the state court that a federal claim is being presented, "a petitioner must make reference to provisions of the federal Constitution or must cite either federal or state case law that engages in a federal constitutional analysis.").

Because there is no lower court decision to look to, and in the absence of any indication to the contrary, this Court presumes that the California Supreme Court denied Claim 1 on the merits. *See Richter*, 562 U.S. at 98. Petitioner asserts that the denial of Claim 1 involved an unreasonable application of the *Strickland* standard. *See* Traverse at 17, ECF 57-6. Accordingly, this Court's task is to determine, based on the state court record, what arguments or theories could have supported the denial of Claim 1 and whether fairminded jurists could disagree as to whether those arguments or theories constitute an unreasonable application of *Strickland*. *See Richter*, 562 U.S. at 102.

The prosecution presented the testimony of Elizabeth Selya, a former employee of the Santa Rosa branch of the California Department of Justice, in the crime lab. RT 4697-99. Ms. Selya testified that the Santa Rosa crime lab received evidence in Petitioner's case, including vials

of blood, sexual assault kits for both J.D. and A.D., and a pink towel. RT 4700-01. Ms. Selya explained that the Santa Rosa crime lab does not have a DNA section, so the evidence was forwarded to another California Department of Justice lab in Sacramento for analysis. RT 4701. Petitioner's counsel cross-examined Ms. Selya, and recross-examined her, asking about the absence of seminal fluid in the girls' vaginal areas, the difficulties in identifying saliva from samples such as the ones in evidence. RT 4715-23, 4725-27.

Deanna Kacer, an employee of the Department of Justice Sacramento crime lab, did the analysis of the evidence. RT 4729-30, 4740-41. Ms. Kacer testified extensively regarding DNA evidence generally and in particular about swabs taken from the breasts of both J.D. and A.D., a swab taken from the neck of A.D., and cuttings from a towel that J.D. said she had used to wipe herself after Petitioner raped her. RT 4729-4771, ECF 42-2. With respect to the breast swabs, Ms. Kacer testified that high levels of amylase on the girls' breasts was indicative of saliva, RT 4771, and both girls' breast swabs showed "a primary DNA profile" which "matched" Petitioner, RT 4743, 4751. Ms. Kacer concluded that the DNA matched Petitioner because the DNA was consistent with Petitioner's DNA, and the odds of the DNA from the girls' breasts occurring in a random population were 1 in 27 sextillion African-Americans, 1 in 2 sextillion Caucasians, and 1 in 15 sextillion Hispanics. RT 4745, 4747-48, 4752-53. In Ms. Kacer's opinion, the DNA found on the girls' breasts was Petitioner's. RT 4771.

Ms. Kacer also testified that A.D.'s neck swab contained DNA consistent with Petitioner's. RT 4750. With respect to the towel, Ms. Kacer testified that it contained DNA from both J.D. and seminal fluid consistent with Petitioner's DNA. RT 4756. It was Ms. Kacer's opinion that the seminal fluid came from a vasectomized male. *Id.* J.D. testified that Petitioner had told her he was vasectomized, so she did not need to worry about getting pregnant. RT 4261.

Petitioner's counsel cross-examined Ms. Kacer, focusing on one of J.D.'s samples that contained DNA not consistent with J.D. or Petitioner. RT 4760-61. Counsel also asked Ms. Kacer about the absence of "[n]ucleated epithelial cells," that is, "cells that are found in the body orifices, such as the mouth, the vagina, the anal cavity, the urethra." RT 4761. Counsel extracted testimony from Ms. Kacer that there were no nucleated epithelial cells found in AD's breast or

16

1   neck swabs, that she could not determine one way or the other whether there were nucleated

2   epithelial cells in J.D.'s breast swab.  RT 4761-63.  Counsel also elicited testimony that the two

3   different DNAs found on the towel were in different locations on the towel.  RT 4768.

4   Petitioner's counsel did not present a defense expert to rebut Ms. Kacer's testimony.

5          The California Supreme Court reasonably could have found that trial counsel's

6   performance was not deficient.  With respect to the assertion that trial counsel failed to investigate

7   the DNA evidence, the record discloses that trial counsel in fact hired a defense DNA expert.  CT

8   72-75, 81-82, RT 2803.  The fact that counsel did not present the expert's testimony gives rise to a

9   reasonable inference that the defense expert's findings were not helpful to Petitioner, and that

10  counsel made a strategic decision not to present them.  Under those circumstances, counsel's

11  reliance on cross-examination to create reasonable doubt may have seemed like the best strategy.

12  *See Richter*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose

13  defects in an expert's presentation.  When defense counsel does not have a solid case, the best

14  strategy can be to say that there is too much doubt about the State's theory for a jury to convict.").

15         Petitioner asserts that counsel should have elicited testimony from Ms. Selya or Ms. Kacer

16  that the presence of amylase on the victims' breasts did not prove that Petitioner's saliva was on

17  them.  However, Petitioner's contention that counsel would have been able to do so is grounded in

18  materials that were not part of the state record, including a work called *Misleading DNA Evidence:*

19  *Reasons for Miscarriage of Justice*, which was published in 2014, and Ms. Selya's crime lab

20  report, which was submitted as Traverse Exhibit 44.  Although Ms. Selya testified and used the

21  report to refresh her recollection, RT 4700, Respondent asserted in his evidentiary objection that

22  the report itself was not contained in the state court record and Petitioner did not dispute that

23  statement.  This Court cannot consider materials that were not part of the state court record in

24  determining whether the California Supreme Court reasonably could have found that counsel's

25  performance was not deficient under *Strickland*.  Based on the record that existed at the time, this

26  Court concludes that the Supreme Court reasonably could have found that counsel's performance

27  was not deficient.

28         The California Supreme Court also reasonably could have found that no prejudice was

caused by counsel's alleged failure to investigate and challenge the DNA evidence. The case against Petitioner was compelling. Both J.D. and A.D. testified in detail about Petitioner's abuse of them over a span of years, J.D. starting when she was twelve years old and A.D. starting when she was younger. RT 4228-4243, 4455, 4472-75. The girls' testimony corroborated each other, and was reinforced by the testimony of Petitioner's former stepdaughter, T.B., who testified to Petitioner's sexual abuse of her starting when she was seven or eight years old and ending when she was twelve or thirteen. RT 5155-61. Others testified that Petitioner gave the girls provocative clothing and touched them inappropriately. RT 4528-30, 4545. A pretext telephone call from J.D. to Petitioner was played to the jury. CT 491-95, RT 4646. The jury reached a verdict on the 10 felony counts in less than six hours of deliberation time. CT 260-65. Consequently, the California Supreme Court easily could have found that even if Petitioner's trial counsel had been able to raise doubts about or even discredit the DNA evidence, that would not have established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because Petitioner has failed to show that the California Supreme Court unreasonably applied *Strickland*, Claim 1 is DENIED.

### 2. Claim 2 - Ineffective Assistance in Failing to Adequately Investigate and Present Evidence that J.D. had Denied any Abuse Occurred

In Claim 2, Petitioner alleges that trial counsel failed to adequately investigate and present evidence that J.D. had denied that any abuse occurred. The claim was raised in Petitioner's pro se habeas petition filed in the California Supreme Court and denied summarily. *See* Am'd Pet. Exhs. 25, 26. No lower court issued a reasoned decision addressing the claim, which therefore is presumed to have been denied on the merits. Petitioner asserts that the denial of Claim 2 involved an unreasonable application of the *Strickland* standard. *See* Traverse at 27, ECF 57-6. This Court therefore must determine, based on the state court record, what arguments or theories could have supported the denial of Claim 2 and whether fairminded jurists could disagree as to whether those arguments or theories constitute an unreasonable application of *Strickland*.

18

J.D. testified that some time during her eighth grade year, a Child Protective Services ("CPS") worker interviewed her at school. RT 4322-24. The CPS worker asked J.D. if her stepfather was abusing her. *Id.* J.D. testified that she lied and said no. RT 4325. J.D. testified that she "answered every question she asked with a lie" and would "say exactly the opposite that was happening." *Id.* J.D. explained that she believed that if she told anyone about the abuse, it would break up her family. RT 4244-46. She stated that before her mother married petitioner, her family had been poor, but that afterward, they lived in a nice house and had a better life. *Id.* She was afraid that all that would be lost if she revealed the abuse. *Id.* She also thought she was protecting her younger sister, A.D. by letting Petitioner "do it" to her; she believed that A.D. – only nine years old – was too young and innocent for Petitioner's abuse. *Id.*

Petitioner submits his own declaration, stating that J.D.'s mother, Patricia, spoke to the CPS worker, Jacqueline Johnson, and that Ms. Johnson assured Patricia she had nothing to worry about. Traverse Exh. 45. Petitioner's declaration also states that his trial counsel promised to locate Ms. Johnson and obtain a copy of her report, but failed to do so. *Id.* Petitioner argues that Ms. Johnson's testimony and report could have been used to impeach J.D.'s testimony regarding Petitioner's sexual abuse. Petitioner contends that the CPS worker could have brought a unique and informed view to bear, citing extensively to the CPS Guide for Caseworkers, which was submitted as Traverse Exhibit 47. Neither Petitioner's declaration nor the CPS Guide may be considered with respect to Claim 2 because those documents were not part of the state court record.

Based on the record that was before it, the California Supreme Court reasonably could have determined that counsel's failure to investigate and present evidence regarding Ms. Johnson did not constitute deficient performance. As noted above, Petitioner's arguments regarding the importance of Ms. Johnson's opinion are grounded in evidence that was not part of the state court record. The California Supreme Court easily could have concluded that trial counsel's decision not to locate and call Ms. Johnson as a witness was well within the scope of his professional judgment. *See Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").

19

The California Supreme Court also reasonably could have found that the failure to pursue the CPS worker did not prejudice Petitioner. J.D. testified that she denied the abuse when asked by the CPS worker, and Petitioner's counsel got her to repeat that point on cross-examination. RT 4323-24. The California Supreme Court could have concluded that Ms. Johnson's testimony would have added little to the trial.

Because Petitioner has failed to show that the California Supreme Court unreasonably applied *Strickland*, Claim 2 is DENIED.

**3. Claim 3 - Ineffective Assistance in Failing to Seek to Exclude Petitioner's Prior Record**

In Claim 3, Petitioner alleges that trial counsel was ineffective in failing to seek to exclude Petitioner's prior record. The claim was raised in Petitioner's pro se habeas petition filed in the California Supreme Court and denied summarily. *See* Am'd Pet. Exhs. 25, 26. No lower court issued a reasoned decision addressing the claim, which therefore is presumed to have been denied on the merits. Petitioner asserts that the denial of Claim 3 involved an unreasonable application of the *Strickland* standard. *See* Traverse at 34, ECF 57-6. Accordingly, this Court's task is to determine, based on the state court record, what arguments or theories could have supported the denial of Claim 3 and whether fairminded jurists could disagree as to whether those arguments or theories constitute an unreasonable application of *Strickland*.

The prosecution moved in limine to admit a 1985 conviction arising from Petitioner's plea of guilty to child molestation under California Penal Code § 288(a). CT 513. Petitioner had molested his stepdaughter from an earlier marriage over a period of five years, starting when the stepdaughter was seven years old. CT 229-30, 513. The trial court granted the prosecution's motion and admitted the evidence of the prior offense, ruling as follows:

> I'm going to admit it over your objection on notice. If you are prejudiced in any way, you need more time, you need any order of the Court, I'll consider that, but I do feel that it is admissible evidence. And I don't even think we reached the [California Evidence Code section] 1101(b), although the similarity of the plan or design is apparent, and it might be independently admitted under 1101(b), but it's clearly admissible under 1108, and I'll admit it under that section.

RT 3554.

California Evidence Code § 1108 provides that: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Cal. Evid. Code § 1108(a). California Evidence Code § 1101 provides in relevant part that: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." California Evidence Code § 352 provides that: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

To summarize the effect of these rules, "[w]hen a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes." *People v. Cordova*, 62 Cal. 4th 104, 132 (2015). "The court has discretion under Evidence Code section 352 to exclude the evidence if it is unduly prejudicial." *Id.* "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." *Id.* The trial courts admission of the prior offense is reviewed for abuse of discretion. *Id.*

Petitioner argues that trial counsel should have objected to admission of the prior offense on "fair trial, due process, and Evidence Code section 352 grounds." Am'd Pet. at 100, ECF 35. The California Supreme Court reasonably could have concluded that counsel's failure to object to the prior offense on the additional grounds outlined by Petitioner did not constitute deficient performance. Applying the standards set forth above, the trial court clearly had discretion to admit the prior offense. Petitioner argues that counsel should have argued that his 1985 conviction was too remote from his charged conduct in 2004 and 2005. However, California decisions have

upheld admission of a prior sex offenses equally remote in time. *See, e.g., Cordova*, 62 Cal. 4th at 133 (13-year old and 18-year old prior sex offenses admissible); (15-year old and 21-year old prior sex offenses admissible). Given the similarity between Petitioner's prior offense and the charges he was facing, the California Supreme Court could have believed that counsel reasonably determined that an objection to the prior offense would not have been well-taken.

The California Supreme Court likewise reasonably could have found that the failure to object on the grounds outlined by Plaintiff was not prejudicial because any such objection would have been futile. In order to find the evidence admissible under § 1108, the trial court necessarily determined that the evidence was not inadmissible under § 352, that is, that the probative value of the prior offense was not outweighed by its prejudicial effect. Given that determination, it is highly unlikely that any objection under § 352, fair trial, or due process grounds would have been sustained.

The Court reiterates that its task is not to determine whether the prior offense was properly admitted, but whether the California Supreme Court reasonably could have concluded that counsel was not deficient in raising the specified objections to admission of the prior offense, or that counsel's failure to raise those objections was not prejudicial. Because the California Supreme Court reasonably could have reached those conclusions on the record before it, Petitioner has failed to show that the California Supreme Court unreasonably applied *Strickland*, and Claim 3 is DENIED.

### 4. Claim 4 - Ineffective Assistance in Failing to Investigate the Factual and Legal Issues of the Case

In Claim 4, Petitioner alleges that trial counsel was ineffective in failing to investigate a number of factual and legal issues in the case. The claim was raised in Petitioner's represented habeas petition filed in the California Supreme Court and denied as untimely. *See* Am'd Pet. Exhs. 31, 32. Because the denial was not on the merits, Claim 4 is subject to de novo review by this Court.

Petitioner correctly asserts that Respondent has waived the defense of procedural default by failing to raise it in response to the amended petition. *See Chaker v. Crogan*, 428 F.3d 1215,

1   1220 (9th Cir. 2005) ("[T]he state waived its procedural default defense by failing to raise the
2   issue in response to Chaker's habeas petition.").  Petitioner acknowledges that a district court may
3   raise the issue of procedural default sua sponte, *see Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th
4   Cir. 1998), but he asks that the Court not do so here.  In light of Respondent's waiver of the
5   defense and the parties' extensive briefing on the merits of Petitioner's claims, the Court finds no
6   reason to address the issue of procedural default sua sponte.

7          Turning to the substance of Petitioner's claim, he contends that trial counsel was
8   ineffective because he failed to:  (a) investigate A.D.'s school records; (b) investigate the
9   immediacy of the family's planned move to Hawaii; (c) have Petitioner evaluated by a
10  psychologist; (d) investigate or challenge the CSAAC report; and (e) investigate the sexual assault
11  examination results.  The Court addresses these asserted failures in turn.

12                    **a.        A.D.'s School Records**

13         Petitioner asserts that trial counsel was ineffective for failing to investigate A.D.'s school
14  records to refute testimony that her grades dropped as a result of the molestation.  Antoinette
15  Moore, who dated the victims' older brother and was a family friend, testified that A.D. became
16  withdrawn and went from being a straight A student, or at least doing very well in school, to
17  getting Fs.  RT 4520-21.  Petitioner's counsel objected, and the trial judge stated that he would
18  "strike the specific reference to the grades dropping from A to F."  *Id*.  The prosecutor moved on.
19  *Id*.  Later in the trial, but before deliberations, a juror submitted a question to the trial court asking
20  whether the jury would see the girls' school records.  CT 457, RT 5154.  The trial judge told the
21  juror that the grades would not be presented.  *Id*.  The prosecutor referenced the exchange once
22  thereafter, stating that he should have gotten the girls' school records, but their mood changes and
23  behavioral patterns would be established by testimony.  RT 5345.

24         Nothing in the record suggests that Petitioner's counsel had any reason to anticipate that
25  A.D.'s grades would be put at issue in the trial.  Antoinette's testimony regarding the grades
26  appears to have been a spontaneous response to a general question regarding A.D.'s behavior.
27  Petitioner's counsel therefore had no reason to obtain A.D.'s grades before trial, and by the time
28  they were mentioned mid-trial, Petitioner's counsel likely could not have obtained the grades in

United States District Court
Northern District of California

23

time to present them to the jury, if he could obtain them at all. Even if obtaining the grades had been possible, counsel's decision not to pursue such a minor and tangential issue appears to be a reasonable, strategic choice rather than an error in judgment. And, trial counsel effectively objected to Antoinette's testimony, causing the statement that A.D.'s grades fell to Fs to be stricken. Under these circumstances, the Court cannot find that counsel's failure to investigate the grades constituted deficient performance.

Moreover, even assuming that in fact A.D.'s grades had not dropped, and that counsel had presented evidence that A.D. continued to get good grades, there is virtually no chance that the outcome of the trial would have been different. Evidence regarding A.D.'s grades would not have impeached A.D., who did not testify about her grades, but would have demonstrated only that Antoinette had been mistaken. In light of the compelling evidence of guilt, including the testimony of J.D. and A.D., the testimony of Petitioner's former stepdaughter T.B., the DNA evidence, and the pretext telephone call from J.D. to Petitioner, any assertion of prejudice is entirely unpersuasive.

### b. Immediacy of Planned Move to Hawaii

Petitioner asserts that counsel was ineffective for failing to investigate when Petitioner planned to move the family to Hawaii. At trial, J.D., her cousin Monique, and family friend Antoinette testified that in the days preceding Petitioner's arrest, J.D. and A.D. had been talking about how they might have to move to Hawaii and that they were not happy about it. RT 4226, 4270, 4610-12, 5132. Petitioner's counsel argued to the jury that J.D. and A.D. had a motive to fabricate the abuse because they did not want to move to Hawaii. RT 5366. In closing argument, the prosecutor noted that there was no evidence that a move to Hawaii was imminent. RT 5376-77.

Petitioner submits his declaration, which is unsigned and undated, but which appears to have been prepared in 2018 according to Petitioner's traverse exhibit list. *See* Traverse Exhibit List; Traverse Exh. 45. The Court considers it on the assumption that a properly signed and dated declaration could be submitted. In the declaration, Petitioner stated that he and the victims' mother, Patricia, had been planning to move the family to Hawaii in June or July 2005; that in

24

February after several layoffs by his employer he and Patricia decided to move the timetable up; and that J.D. and A.D. both knew that the move would be soon. Traverse Exh. 45 at ¶¶ 28-37. Finally, Petitioner stated that his trial counsel promised to interview both his employer and Patricia, but they never did. Traverse Exh. 45 at ¶ 38.

Even accepting Petitioner's declaration statements, the Court finds that counsel's failure to investigate the immediacy of the move did not constitute deficient performance. It was undisputed that J.D. and A.D., as well as Monique and Antoinette, were aware of the planned move to Hawaii. As noted above, J.D., Monique, and Antoinette testified as much. RT 4226, 4270, 4610-12, 5132. Therefore, the basis for the theory that J.D. and A.D. fabricated the allegations against Petitioner was in evidence. Investigation as to what Petitioner's employer and Patricia knew about the timing of the move would not have supported the fabrication theory if J.D. and A.D. did not have the same knowledge. Under these circumstances, the Court finds that the decision not to pursue that theory fell within the "wide range of reasonable professional assistance." *See West*, 608 F.3d at 486.

The Court also finds that counsel's failure to pursue the theory was not prejudicial, because it is not reasonably probable that the outcome of the trial would have been different had counsel presented evidence that J.D. and A.D. knew that the move to Hawaii was imminent. It is simply not plausible that the outcome of the trial was altered by the prosecutor's single statement in closing argument that there was no evidence of the immediacy of the move to Hawaii. As discussed at length throughout this order, the evidence against Petitioner was overwhelming. Against the backdrop of the victims' testimony, the testimony of Petitioner's former stepdaughter, the DNA evidence, and the pretextual telephone call, it is wholly unlikely that the jury's verdict would have been altered by testimony from Petitioner's employer and/or Patricia regarding the timing of the planned Hawaii move.

### c. Evaluation of Petitioner by a Psychologist

Petitioner asserts that counsel was ineffective in failing to have him evaluated by a psychologist. Under California law, a defendant charged with child molestation may introduce expert opinion testimony that the defendant is not a sexual deviant and is not predisposed to

molest children. *People v. McAlpin*, 53 Cal. 3d 1289, 1305 (1991). That type of expert is called a "*Stoll*" expert, after the case that recognized the right, *People v. Stoll*, 49 Cal. 3d 1136 (1989). Petitioner stated in his declaration that he asked counsel to have him evaluated by a psychologist, but that counsel "kept telling me to wait and that they were working out the best way to present my case." Traverse Exh. 45 at ¶ 43. Eventually, counsel told Petitioner it was too late to get an expert. *Id.*

Based on counsel's statements to Petitioner, it appears that the decision not to obtain a Stoll expert was a strategic one. The Court finds counsel's decision not to pursue a defense that Petitioner is not predisposed to molest children to be entirely reasonable in light of Petitioner's prior conviction for sexually abusing his former stepdaughter starting when she was only seven or eight years old. *See Siripong*, 133 F.3d at 736 ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.").

Moreover, the Court finds that Petitioner has not demonstrated that counsel's failure to obtain a *Stoll* expert was prejudicial. Petitioner's suggestion that a *Stoll* expert could have been found to testify for him is entirely speculative. *See Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (no prejudice shown based on counsel's failure to investigate petitioner's medical history, where petitioner merely speculating that such investigation might have shown organic brain damage).

### d. CSAAS Evidence

Petitioner asserts that trial counsel was ineffective for failing to investigate whether the prosecution's expert on Child Sexual Abuse Accommodation Syndrome ("CSAAS") could be rebutted. The expert, Dr. Urquiza, testified regarding the effects of sexual abuse on children and, among other things, why a child might not report such abuse. RT 4620-39.

Petitioner asserts that he "asked trial counsel to retain an expert to challenge the CSAAS evidence," but that "[t]rial counsel assured petitioner that such an expert was unnecessary." Traverse at 52, ECF 57-6. It is apparent from Petitioner's assertion that trial counsel made a strategic decision not to challenge the prosecution's CSAAS expert, Dr. Urquiza. As discussed in

more detail below, California law expressly permits CSAAS evidence "to dispel common misconceptions the jury may hold as to how such children react to abuse." *People v. Mateo*, 243 Cal. App. 4th 1063, 1069 (2016). Counsel reasonably could have concluded that it made more sense to try to show reasonable doubt as to whether Petitioner molested J.D. and A.D. rather than challenging how CSAAS played into this case. Nothing in this record suggests that counsel's decision "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Moreover, the Court finds that Petitioner has not established prejudice. First, it is entirely speculative whether a CSAAS expert would have testified for Petitioner and what such expert would have said. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) ("Wildman offered no evidence that an arson expert would have testified on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice."). Second, given the substantial evidence of guilt discussed elsewhere in this order, the Court finds it highly unlikely that Petitioner's presentation of a defense CSAAS expert would have altered the outcome of the trial.

### e.    Sexual Assault Examination Results

Petition contends that counsel was ineffective for failing to investigate the results of the sexual assault examinations of J.D. and A.D., including whether there was damage to the victims' hymens. The assault examinations were performed by Michael Knappman, a physician's assistant employed with the County Public Health Department, who is an expert in pediatric forensic medical examinations. RT 4649-52. Mr. Knappman conducted forensic sexual assault examinations on both J.D. and A.D. on March 2, 2005. RT 4652-53. Mr. Knappman testified that J.D. stated that Petitioner's last sexual assault had been on February 25, 2005; Mr. Knappman took swabs from J.D.'s mouth, neck, breast, and suprapubic area. RT 4666-67. Mr. Knappman testified that A.D. stated that Petitioner's last sexual assault had been on March 1, 2005; Mr. Knappman took swabs from A.D.'s neck, breast, suprapubic area, and buttocks. RT 4658-61. Mr. Knappman gave both girls' swabs to law enforcement officials.

Petitioner asserts that Mr. Knappman's report, attached to the Traverse as Exhibit 52, indicated that there were no signs of physical trauma to the girls' hymens. *See* Traverse Exh. 52.

Petitioner cites to studies which he claims show that victims of sexual assault generally have a high prevalence of physical trauma. Petitioner theorizes that if his counsel had hired an expert, the expert would have testified that the absence of physical trauma to J.D.'s vagina undermined her claim of abuse.

The Court finds that counsel's failure to retain an expert did not constitute deficient performance. Petitioner's counsel is presumed to have reviewed Mr. Knappman's report, and to have determined that its contents did not warrant further investigation. The prosecutor asked Mr. Knappman at trial whether he had observed anything during examination that he thought was consistent with being nicked by a fingernail. RT 4664-65. Petitioner's counsel successfully objected. *Id.* The fact that the prosecutor asked the question, and that Petitioner's counsel objected, suggests that the answer would have been unfavorable to Petitioner. Thus, even if the girls' hymen tissue itself was not traumatized, it appears that Petitioner's counsel may have had good reason not to pursue an investigation regarding the girls' forensic examinations.

Moreover, it does not appear that the state of the girls' hymens was the focus of testimony by Mr. Knappman or any other witness. Mr. Knappman's testimony was primarily foundational, as he is the person who collected the samples that were the subject of the DNA testimony. The prosecutor did not rely on the existence of physical trauma to the victims. That is consistent with J.D.'s statements to Mr. Knappman that Petitioner last assaulted her on February 25, 2005, several days prior to the forensic examination on March 2, 2005, and A.D.'s statements that Petitioner never had vaginal intercourse with her. Under those circumstances, counsel reasonably could have concluded that the lack of trauma to the hymen tissue was explained.

Moreover, the Court finds that the failure to retain an expert to testify about the lack of trauma was not prejudicial. It is pure speculation that any expert would testify that the lack of trauma to J.D.'s vaginal area was inconsistent with her testimony regarding the years of abuse. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir.1997) (speculating as to what expert would say is not enough to establish prejudice). Even if an expert had testified on the subject, the jury may well have attributed the lack of trauma to the passage of time between Petitioner's last intercourse with J.D. and the examination.

After considering Plaintiff's claims and reviewing the record de novo, the Court concludes that Petitioner's litany of acts that he believes counsel could have taken is insufficient to demonstrate either deficient performance or prejudice under the *Strickland* standard. Accordingly, Claim 4 is DENIED.

### 5. Claim 5 - Ineffective Assistance in Failing to Object to the Introduction of Unreliable Evidence

In Claim 4, Petitioner alleges that trial counsel was ineffective in failing to object to the introduction of unreliable evidence. Specifically, Petitioner asserts that counsel should have objected to the prosecution's evidence regarding Child Sexual Abuse Accommodation Syndrome ("CSAAS"). As discussed above, the prosecution presented the testimony of Dr. Urquiza to educate the jury about CSAAS. RT 4622. Dr. Urquiza did not opine whether Petitioner had engaged in the charged conduct. He testified regarding five common characteristics of sexually abused children. RT 4620-40.

The claim was raised in Petitioner's represented habeas petition filed in the California Supreme Court and denied as untimely. *See* Am'd Pet. Exhs. 31, 32. Because the denial was not on the merits, Claim 5 is subject to de novo review by this Court.

Under California law, "Expert testimony about CSAAS is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children." *Mateo*, 243 Cal. App. 4th at 1069. However, "such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse." *Id.*

Counsel was not deficient in failing to object to the CSAAS evidence, because as noted above it was not admitted for an impermissible purpose, for example, to show that abuse occurred in this case. Petitioner argues that counsel should have objected when Dr. Urquiza was asked hypotheticals paralleling the facts in this case. Petitioner has not cited any authority for the proposition that such hypotheticals are impermissible. The case upon which Petitioner relies, *People v. Bowker*, 203 Cal. App. 3d 385, 395 (1988), precludes CSAAS evidence submitted to prove that abuse occurred in a particular case. Moreover, in *Bowker*, the court found that even if

the testimony in question crossed the line and suggested that abuse had occurred, no prejudice resulted because the jury would have found abuse based on other substantial evidence in the record. *Id.* at 395. The same is true in the present case.

Accordingly, after de novo review of the record, the Court concludes that counsel was not deficient in failing to object to CSAAS evidence, and that even if he was deficient there was no prejudice because the jury would have found abuse based on other substantial evidence in the record. Claim 5 is DENIED.

### C. Claim 6 (Cruel and Unusual Punishment)

In Claim 6, Petitioner alleges that his sentence of 307 years to life in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Claim 6 was raised in Petitioner's petition for direct review filed in the California Supreme Court. *See* ECF 16-1. The petition for review was denied summarily. *See* Am'd Pet. Exh. 18. However, this Court may look through that decision to the California Court of Appeal's underlying decision on direct review, which denied the Eighth Amendment claim on the merits. *See Skidmore*, 2009 WL 2766801, at *5-6. Petitioner claims that the denial of Claim 6 involved an unreasonable application of the Supreme Court's decision in *Trop v. Dulles*, 356 U.S. 86 (1958). *See* Traverse at 65, ECF 57-6. Accordingly, this Court's task is to determine whether the California Court of Appeal's denial of Claim 6 involved an unreasonable application of *Trop*, the Supreme Court authority identified by Petitioner.

The California Court of Appeal addressed Petitioner's cruel and unusual claim under the Eighth Amendment and under the California constitution as follows:

> 1. *Eighth Amendment*
> A sentence may violate the Eighth Amendment if it is grossly disproportionate to the defendant's crimes. In a noncapital case, however, a violation based on disproportionality is rarely found and the circumstances must be extreme. (*See Lockyer v. Andrade* (2003) 538 U.S. 63, 73; *Rummel v. Estelle* (1980) 445 U.S. 263, 271-272.)
>
> Considerations in determining whether a sentence is impermissibly disproportionate under the Eighth Amendment are: "[(1)] the gravity of the offense and the harshness of the penalty; [(2)] the sentences imposed on other criminals in the same jurisdiction; and [(3)] the sentences imposed for commission of the same crime in other jurisdictions." (*Solem v. Helm* (1983) 463 U.S. 277, 292 (*Solem* ); accord, *Harmelin v. Michigan* (1991) 501 U.S. 957, 965.)

30

### 2. *California Constitution*

Under the California Constitution, a sentence constitutes cruel and unusual punishment if it is "'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)  As under the Eighth Amendment, successful challenges based on disproportionality under California law are an "exquisite rarity." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.)

To determine the proportionality of a sentence under California law, the courts have suggested three "techniques" similar to the factors considered under the Eighth Amendment: (1) comparing the nature of the offense and offender, including the danger they present to society, to the harshness of the sentence; (2) comparing the challenged punishment to punishments for more serious crimes in the same jurisdiction; and (3) comparing the challenged punishment to punishments for the same offense in other jurisdictions. (*Lynch*, supra, 8 Cal.3d at pp. 425-427; *see Dillon*, supra, 34 Cal.3d at p. 479.)

### 3. *Application*

As to the nature of the offense and offender, Skidmore was convicted of nine felony sexual offenses perpetrated on his own stepdaughters, who were under the age of 14.  For years he repeatedly and continuously molested and raped them, despite their pleas for him to stop, while their drunken mother was asleep.  He convinced them not to tell anyone for fear they would break up their family.  While the charges on this sexual abuse were pending, Skidmore was convicted of soliciting a former inmate to kill their mother, assault their brother, and bribe the young victims to recant.

The gravity of Skidmore's crimes must be assessed in light of his past criminal history and recidivism. (*See Solem*, *supra*, 463 U.S. at p. 296 [state is justified in punishing a recidivist more severely than it punishes a first offender]; *People v. Cooper* (1996) 43 Cal.App.4th 815, 820-825.) Skidmore had a prior molestation conviction for sexually assaulting his preteen stepdaughter in another relationship. Despite the prior conviction, he failed to reform.  The nature of his offenses, as well as his recidivism, make him a danger to society.

Skidmore does not attempt to compare his sentence with more serious offenses in California or with punishments in other states for the same offenses.  We may take this as "a concession that his sentence withstands a constitutional challenge on either basis." (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 (*Retanan* ).) In any event, we conclude his sentence is not disproportionate to his crimes and recidivism.  Because we do not find an inference of disproportionality, there is no need to compare his sentence to other sentences in California or in other jurisdictions.

Skidmore relies on the concurring opinion of Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585, 600, to assert that his sentence is cruel and unusual because it is "ridiculously long" and "[n]o human being could possibly hope to complete even half this term."  Because Justice Mosk's concurring opinion has no precedential value, there is no support for Skidmore's argument. (*Retanan*, *supra*, 154 Cal.App.4th at p. 1231 [upholding sentence of 135 years, over the same objection, for multiple sex offenses]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [upholding sentence of 283 years eight months for multiple sex offenses].) Skidmore has failed to establish that his sentence constitutes cruel and unusual punishment.

*People v. Skidmore*, 2009 WL 2766801, at *5–6.

Petitioner contends that the denial of his Eighth Amendment claim involved an unreasonable application of the Supreme Court's 1958 decision, *Trop v. Dulles*. In *Trop*, the petitioner was stripped of his United States citizenship by reason of his conviction by court-martial for wartime desertion. The issue before the Supreme Court was whether forfeiture of citizenship under those circumstances "comports with the Constitution." *Trop*, 356 U.S. at 86-87. The Supreme Court answered that question in the negative, holding that "the Eighth Amendment forbids Congress to punish by taking away citizenship." *Id.* at 103. The present case does not involve an unreasonable application of *Trop* or, indeed, *any* application of *Trop*, as *Trop* is completely distinguishable from the present case both legally and factually.

Petitioner also cites *Graham v. Florida*, 560 U.S. 69 (2010), and *Furman v. Georgia*, 408 U.S. 238 (1972). In *Graham*, the Supreme Court held that life without parole violates the Eighth Amendment when imposed on juvenile nonhomicide offenders. In *Furman*, the Supreme Court held that Georgia and Texas capital sentencing statutes violated the Eighth and Fourteenth Amendments. Neither case is directly relevant to the present case, which does not involve a juvenile offender or a capital sentencing statute. Petitioner has plucked general language from both cases in support of his assertion that his sentence is so excessive as to render it unconstitutional. However, citation to general language taken out of context is insufficient to show that the California Court of Appeal's decision in the present case constituted an unreasonable application of either *Graham* or *Furman*.

The California Court of Appeal identified the relevant United States Supreme Court authority, *Lockyer v. Andrade*, which holds that under "Eighth Amendment jurisprudence, one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). Because the precise contours of the gross disproportionality principle are unclear, a state court's application of it will meet the "unreasonable application" standard "only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73. This is because "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the

rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Richter*, 562 U.S. at 101.

Here, the California Court of Appeal determined that Petitioner's sentence was not grossly disproportionate after considering the nature of the offense and his prior conviction. The appellate court noted that Petitioner was convicted of nine felony sexual offenses perpetrated on his own stepdaughters, who were under the age of 14. The appellate court also emphasized that Petitioner is a recidivist, in that he was convicted of virtually identical sexual abuse of another stepdaughter, and yet he failed to reform. To the contrary, while the sexual abuse charges in the present case were pending, Petitioner was convicted of soliciting a former inmate to kill the victims' mother, assault their brother, and bribe the victims to recant. On that record, the California Court of Appeal concluded that Petitioner's sentence is not disproportionate to his crimes and recidivism.

Petitioner does not challenge any particular aspect of the state appellate court's reasoning. He simply asserts that his sentence is excessive and exceeds his life expectancy. This argument is without merit, as illustrated by the Ninth Circuit's decision in *Norris v. Morgan*. In that case, Norris was convicted of one count of child molestation and was sentenced to life in prison without the possibility of parole. *Norris v. Morgan*, 622 F.3d 1276, 1281 (9th Cir. 2010). "The factual specifics of Norris's offense involved him touching a five-year-old girl on her 'privates' or 'genitalia' and over her clothing for at most 'a couple of seconds.'" *Id*. at 1293. The Ninth Circuit held that "the question in this case is not whether Norris's most recent first-degree child molestation offense would by itself justify the harsh sentence he received. Because Norris was sentenced as a recidivist under the two strikes law, in weighing the gravity of his offense, we must place on the scales not only his current felony, but also his criminal history." *Id*. at 1294 (internal quotation marks, citation, and brackets omitted). The Ninth Circuit concluded that "Norris's sentence is not grossly disproportionate to his crime and so does not violate the Eighth Amendment's prohibition against cruel and unusual punishment," and on that basis upheld the district court's denial of habeas relief on Norris's Eighth Amendment claim. *Id*. at 1296. If the sentence in *Norris* did not run afoul of the Eighth Amendment, Petitioner's sentence here clearly does not either, as Petitioner's conduct and criminal history is far more severe than that of the

defendant in *Norris*.

Accordingly, Claim 6 is DENIED.

**D.    Claim 7 (Cumulative Error)**

In Claim 7, Petitioner asserts that all of the trial errors alleged in Claims 1-6 deprived him of a fair trial in violation of the Due Process Clause.  The claim was raised in Petitioner's represented habeas petition filed in the California Supreme Court and denied as untimely.  See Am'd Pet. Exhs. 31, 32.  Because the denial was not on the merits, Claim 7 is subject to de novo review by this Court.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).  "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  However, "cumulative error warrants habeas relief only where the errors have so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id*. (internal quotation marks and citation omitted).

As discussed above, Petitioner has failed to demonstrate the existence of any errors in his trial, let alone an accumulation of errors that infected the trial with unfairness.  Accordingly, Claim 7 is DENIED.

**IV.    PETITIONER IS NOT ENTITLED TO AN EVIDENTIARY HEARING**

In his reply in support of his motion for an evidentiary hearing, Petitioner requests the following relief:

> For the forgoing reasons, petitioner respectfully requests that this Court: (1) rule that petitioner is entitled to equitable tolling; (2) find that there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief" as contemplated by the Rules Governing 2254 Cases; and (3) set a briefing schedule with the parties regarding petitioner's forthcoming motion for discovery.

> In the alternative, petitioner respectfully requests that the Court grant an evidentiary hearing as to Claims 1, 2, 3, 4, 5, and 7 and as to equitable tolling issues, only if needed given respondent's admission that petitioner has shown "sufficient grounds for equitable tolling."  Opposition at 22, Doc #71 at 29.

Reply Re Motion for Evid. Hrg. at 31, ECF 77.

With respect to item (1), Respondent expressly has conceded that Petitioner is entitled to equitable tolling under the facts alleged in the amended petition, and the Court agrees. Petitioner has demonstrated his own diligence in pursuing habeas relief and his former attorney's abandonment of his case. With respect to items (2) and (3), the Court finds that Petitioner's claims are *not* potentially meritorious for the reasons discussed in section III, above, and therefore it finds no basis to set a briefing schedule regarding a discovery motion.

The Court likewise finds no basis to grant an evidentiary hearing as to any of Petitioner's claims.

### A. Legal Standard

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.* "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* "The Ninth Circuit has recognized this point in other cases, holding that an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Id.* (internal quotation marks and citation omitted). "This principle accords with AEDPA's acknowledged purpose of reducing delays in the execution of state and federal criminal sentences." *Id.* at 475 (internal quotation marks, citation, and alteration omitted). Accordingly, district courts are not "required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings." *Id.*

### B. Claims 1, 2, and 3

With respect to Claims 1, 2, and 3, which were adjudicated on the merits in state court, this Court's review under § 2254(d) is limited to the state court record. *Pinholster*, 563 U.S. at 181. "This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether

the claim meets the requirements of § 2254(d)." *Gulbrandson*, 738 F.3d at 993-94.

Petitioner contends that despite the foregoing, the Court may order an evidentiary hearing with respect to Claims 1, 2, and 3. He asserts two separate bases for that contention. First, Petitioner argues that *Pinholster* does not a deprive federal courts of discretion to order an evidentiary hearing prior to conducting a § 2254(d) review. Petitioner cites two district court decisions in which the courts did just that. *See Lopez v. Miller*, 906 F. Supp. 2d 42 (E.D.N.Y. 2012); *Dennis v. Chappell*, No. 5-98-CV-21027-JF, 2012 WL 4392141 (N.D. Cal. Sept. 25, 2012). In both *Lopez* and *Dennis*, the district courts acknowledged that any evidence presented at the evidentiary hearing could not be considered when evaluating the merits of the habeas claims under § 2254(d). In *Lopez*, the district court concluded that such evidence could be considered in connection with the petitioner's claim of actual innocence under 28 U.S.C. § 2254(a). *See Lopez*, 906 F. Supp. 2d at 55-56. In *Dennis*, the district court contemplated the possibility that the evidentiary hearing might produce evidence warranting a stay while the petitioner sought to present the evidence to the state court. *Dennis*, 2012 WL 4392141, at *3. It is unclear what purpose Petitioner believes would be served by holding such an evidentiary hearing in this case. This Court perceives no benefit to holding an evidentiary hearing on Claims 1, 2, and 3 when it could not consider any resulting evidence in deciding those fully briefed claims.

Second, Petitioner argues that Claims 1, 2, and 3 are subject to de novo review and therefore are not subject to the evidentiary restrictions applicable to claims reviewed under § 2254(d). Petitioner's reasoning goes as follows: Claim 7, asserting cumulative error, is based on all of the claims in the amended petition; Claim 7 is subject to de novo review; therefore, all of the claims in the amended petition likewise are subject to de novo review.

The Court agrees that Claim 7 is subject to de novo review. However, it does not follow that all of Petitioner's other claims must be reviewed de novo as well. Petitioner has not cited, and this Court has not discovered, any case adopting Petitioner's suggested approach. To the contrary, at least one district court faced with this precise situation – a claim of cumulative error subject to de novo review which was based in part on underlying claims subject to § 2254(d) review – applied the § 2254(d) standard to the underlying claims and then determined de novo whether the

cumulation of the alleged errors in the petition entitled the petitioner to relief. *See Iniguez v. Bitter*, No. CV 12-975-SVW (MAN), 2015 WL 9813500, at *28 (C.D. Cal. Mar. 5, 2015), report and recommendation adopted, 2016 WL 204336 (C.D. Cal. Jan. 13, 2016).

Petitioner's reliance on *Jacobs v. Long*, a decision from the Central District of California, and *Cargle v. Mullin*, a decision from the Tenth Circuit, is misplaced. In *Jacobs*, it appeared that although the state court had rejected a cumulative error claim on the merits, the petitioner's federal cumulative error claim was broader and included errors not presented to the state court. *Jacobs v. Long*, No. SACV 12-1972-VBF (JEM), 2015 WL 10578936 (C.D. Cal. Nov. 23, 2015), report and recommendation adopted, 2016 WL 1305094 (C.D. Cal. Mar. 31, 2016). Under those circumstances, the district court decided that the most prudent course was to consider the federal cumulative error claim de novo rather than under the deferential AEDPA standard. *See id*. at *51. Nothing in *Jacobs* suggests that a cumulative error claim alters the legal standard applicable to the underlying claims. *See id.* In *Cargle*, the Tenth Circuit held that claims asserting errors under *Strickland v. Washington*, 466 U.S. 668 (1984), or *Brady v. Maryland*, 373 U.S. 83 (1963), "should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). *Cargle* does not, however, suggest that the standard of review applicable to underlying claims of error under *Strickland* or *Brady* is altered by a claim of cumulative error. *See id.*

In conclusion, Claims 1, 2, and 3 are subject to review under § 2254(d), and that review is limited to the state court record. As discussed above in section III, Claims 1, 2, and 3 do not satisfy § 2254(d) and are denied on that basis. Accordingly, Petitioner's motion for an evidentiary hearing on Claims 1, 2, and 3 is DENIED.

## C.    Claims 4, 5, and 7

With respect to Claims 4, 5, and 7, the Court concludes that there is no possibility that an evidentiary hearing could enable Petitioner to prove that he is entitled to habeas relief. After reviewing the entirety of the trial record, the Court concludes that even if all of Petitioner's allegations regarding trial counsel's conduct described in Claims 4 and 5 are accepted as true, counsel's conduct did not constitute deficient performance. Moreover, it is clear from the trial

record that even if counsel's performance were deficient, Petitioner did not suffer resulting prejudice within the meaning of *Strickland*. Finally, because Plaintiff cannot establish any trial errors in Claims 1-6, he cannot establish an accumulation of trial errors that were so prejudicial as to render the trial "fundamentally unfair" as would be required to prevail on Claim 7. *See Parle*, 505 F.3d at 927.

These conclusions do not depend on any disputed facts and would not be altered by further development of the factual record. "[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (affirming magistrate judge's denial of evidentiary hearing based on conclusion that petitioner had not suffered prejudice from counsel's failure to present a particular defense).

The Court notes that the parties devote substantial briefing to the question of whether Petitioner has satisfied the requirements of 28 U.S.C. § 2254(e)(2), which limits the availability of an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." The Court need not address § 2254(e)(2) in light of its conclusion that Petitioner is not entitled to an evidentiary hearing for the reasons discussed above.

Accordingly, Petitioner's motion for an evidentiary hearing on Claims 4, 5, and 7 is DENIED.

## V.     CERTIFICATE OF APPEALABILITY

A certificate of appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a certificate of appealability in this Court, but he may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

//

//

**VI.   ORDER**

    (1)    Petitioner's amended petition for a writ of habeas corpus is DENIED;

    (2)    Petitioner's motion for an evidentiary hearing is DENIED; and

    (3)    A certificate of appealability is DENIED.

Dated: March 18, 2019

BETH LABSON FREEMAN
United States District Judge